## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

$50,240.00 IN UNITED STATES CURRENCY,

$6,109.00 IN UNITED STATES CURRENCY,

  and

$2,000.00 IN UNITED STATES CURRENCY,

    *Defendants-in-rem.*

Civ. No. 20-1033

### VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, United States of America, brings this complaint in accordance with Supplemental Rule G(2) of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions, and alleges as follows:

### NATURE OF THE ACTION

1. This is a civil action to forfeit and condemn to the use and benefit of the United States of America property involved in violations of the Controlled Substances Act and 18 U.S.C. § 1952 that is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(C).

### *DEFENDANTS-IN-REM*

2. The defendants-in-rem consist of the following:

    i. Fifty Thousand Two Hundred and Forty Dollars ($50,240.00) in United States Currency;

1

      ii. Six Thousand One Hundred and Nine Dollars ($6,109.00) in United States Currency; and

      iii. Two Thousand Dollars ($2,000.00) in United States Currency (hereafter collectively referred to as "Defendant Currency").

3.    Defendant Currency was seized by the U.S. Department of Homeland Security, U.S. Customs and Border Protection, on May 3, 2020, in the District of New Mexico, and thereafter transferred to the custody of the U.S. Department of Justice, Drug Enforcement Administration.

4.    Defendant Currency is now, and during the pendency of this action will be, in the jurisdiction of this Court.

## JURISDICTION AND VENUE

5.    The United States District Court for the District of New Mexico has subject matter jurisdiction under 28 U.S.C. §§ 1345, 1355(a) and 1356.

6.    Venue for this civil forfeiture action is proper in this district pursuant to 28 U.S.C. §§ 1355 and 1395, as acts or omissions giving rise to the forfeiture took place in this district and the property is found in this district. Upon the filing of this complaint, Defendant Currency will be arrested by execution of a Warrant for Arrest *In Rem* in the District of New Mexico.

## FACTS

7.    On May 3, 2020, at approximately 12:05 pm, U.S. Border Patrol Agent ("BPA") O. Davila encountered a white GMC Yukon XL bearing Georgia license plate CAK4028 ("the vehicle") while assigned to primary inspection duties at the Interstate 10 checkpoint west of Las Cruces, which is located in the District of New Mexico. At primary inspection, an alarm on the license plate reader notified BPA Davila that the vehicle had been reported stolen. BPA Davila

asked the driver, identified as Tracy Wade, who the vehicle belonged to, and he replied that it was a rental.

8.  BPA Davila observed two other individuals inside of the vehicle, later identified as Christopher Idlebird and Trevon Harrison. BPA Davila asked Wade for permission to search the vehicle with her government-assigned canine, "Apace." Wade agreed to the canine sniff and BPA Davila directed the vehicle to the secondary inspection area of the checkpoint near BPA A. Estrada. While BPA Estrada was guiding the vehicle into the secondary inspection area, BPA B. Hoffman walked over from the commercial vehicle lane and informed the BPAs at secondary inspection that a commercial truck driver passing through the commercial lane reported observing the same vehicle (GMC Yukon XL bearing Georgia license plate CAK4028) stopped on the highway a few miles before the checkpoint throwing items onto the ground.

9.  BPAs escorted the three vehicle occupants inside the checkpoint. BPA Aguilera then used her government-assigned canine, Apace, to conduct a canine sniff of the vehicle, and Apace positively alerted to the scent of controlled substances. BPA Aguilera asked the three vehicle occupants if there were any controlled substances or large quantities of money inside of the vehicle. All three of the vehicle occupants admitted to having marijuana and to having an unknown, large amount of U.S. currency in various locations throughout the vehicle.

10. BPAs then conducted a systematic search of the vehicle, which revealed approximately 79.2 gross grams of marijuana and 1.8 gross grams of miscellaneous pills. BPAs discovered a tray with testable amounts of a green leafy substance that appeared to be marijuana underneath and behind the driver's seat, and, in the vehicle's rear cargo area, they also found a large plastic tote with several fabric softener dryer sheets and visible marijuana residue. In the

experience of BPA Davila, dryer sheets are often used as a masking agent when attempting to conceal the odor of controlled substances.

11. The systematic search of the vehicle also revealed a red Nike bag with several large bundles of U.S. currency ($50,240.00 total), a small camouflage bag containing a bundle of U.S. currency ($6,109.00 total), and additional U.S. currency in the center console between the two front seats ($2,000.00 total). The $50,240.00 in U.S. Currency inside the red Nike bag contained individual stacks of multi-denominational currency consistently contained in rubber bands, which is consistent with currency indicative of illegal proceeds.

12. BPAs also located a Glock Model 42 .380-caliber pistol in the vehicle, and a loaded Glock Model 19 9mm pistol with a round in the chamber in the seat pouch behind the driver's seat. The third row rear seat of the vehicle contained an empty duffle bag and a backpack. Inside the backpack, BPAs found a Glock Model 23 .40-caliber pistol with a round chambered and a 50-round drum magazine affixed.

13. Following the systematic search of the vehicle, BPAs separated the three vehicle occupants, read each their Miranda warnings, and after each waived the same, performed the first of two interviews of the three individuals. A second interview of each individual was conducted shortly thereafter by Special Agents ("SAs") C. Akard and L. Bell of the U.S. Drug Enforcement Administration ("DEA").

**A. Interviews of the Vehicle Occupants**

### Trevon Harrison

*First Interview of Trevon Harrison by BPAs Aguilera and Delgado*

14. BPAs Aguilera and Delgado asked Harrison about the details of his travel, and Harrison claimed that the three were traveling to Las Vegas, Nevada, from Houston, Texas, for a bachelor party. Harrison denied knowledge or ownership of any of the guns in the vehicle and

4

further stated that the money in the red bag belonged to all three subjects in the vehicle. Harrison stated he had about $10,000 to $15,000 in the bag but was unsure how much. He stated that the money was for partying and a bachelor's party in Las Vegas. Harrison explained that he and Wade had been planning the trip to Las Vegas for a while – at least a few months – but thought they would figure out the details when they got there. Confused by the contradiction in Harrison's statement, BPA Delgado asked Harrison if the trip was a spur of the moment trip. Harrison nodded excitedly and said that he and Wade made last minute plans to go to Vegas and had brought Idlebird along to party. BPA Delgado then asked Harrison about his flip-flopping statement, and Harrison returned to his previous statement and said that he and Wade had been planning the trip for a long time through text messages and phone calls. Idlebird, however, was unable to say where they were going to be staying, who was going to be getting married, or the length of their trip. When confronted with the information that Las Vegas had multiple closures throughout the city (including all casinos) due to COVID-19,[1] Harrison denied knowing that there were any COVID-19 closures outside of Texas. BPA Aguilera asked Harrison what he did for a living, to which he replied that he had two businesses, one of which is a garbage valet service. Harrison failed to elaborate on his second business.

*Second Interview of Trevon Harrison by SAs Akard and Bell*

---

[1] *See, e.g.,* https://www.foxnews.com/travel/las-vegas-casinos-reopen-eager-guests (last visited Oct. 7, 2020) (noting the partial reopening of some Las Vegas casinos on June 4, 2020, and observing that casinos had been shuddered for seventy-eight (78) days as of June 4, 2020); https://www.usatoday.com/story/travel/news/2020/06/04/las-vegas-reopening-casinos-downtown-open-coronavirus-measures/3133863001/ (last visited Oct. 7, 2020) (noting June 4, 2020, as the date casinos reopened after the lockdown in Las Vegas); https://lasvegassun.com/news/2020/jun/04/were-back-casinos-reopen-after-unprecedented-shutd/ (last visited Oct. 7, 2020) (same).

15. SAs Akard and Bell reminded Harrison of his Miranda Rights by showing Harrison the advice of rights form he previously signed. Harrison acknowledged he still understood his rights and still wished to speak to agents without an attorney present.

16. Harrison related to SAs Akard and Bell that he was picked up in Austin, Texas, and that they were driving to Los Angeles, California, to pick up a friend, then on to San Francisco, California, to pick up another friend, after which they were all heading to Las Vegas, Nevada. Harrison stated they were going to Las Vegas for a "guy named Jay's" bachelor party. Harrison stated they did not have a place to stay in Las Vegas. SAs then asked Harrison what belonged to him inside of the vehicle. Harrison stated he had approximately $20,000-$25,000 inside of the red backpack. Harrison denied ownership of any weapons in the vehicle, and specifically disavowed ownership of the Glock 23 with the 50-round drum.

## **Christopher Idlebird**

*First Interview of Christopher Idlebird by BPAs Aguilera and Delgado*

17. Idlebird related to BPAs Aguilera and Delgado that Harrison was a good friend of his that he had known for about a year and a half to two years, and that that he did not know where the trio would ultimately be staying, just that that they were going to Las Vegas to party. Idlebird stated that Harrison and Wade, who he had met on at least two previous occasions, had their own agenda and that he was going to shop and sightsee on his own. BPAs explained that because of COVID-19 closures, Idlebird would have a hard time doing any of that. Idlebird then replied that really, he was just along for the ride, because Harrison had invited him and had told him he would be "taken care of" on the trip. Idlebird said that he did plan on getting his own hotel room, but did now know any particulars of the trip beyond that. When asked, Idlebird claimed the Glock Model 42 .380-caliber pistol and between $7,000 and $10,000 in U.S.

currency found in the vehicle, although he denied ownership or knowledge of the two other weapons in the vehicle.

*Second Interview of Christopher Idlebird by SAs Akard and Bell*

18. SAs Akard and Bell reminded Idlebird of his Miranda Rights by showing Idlebird the advice of rights form he previously signed. Idlebird acknowledged he still understood his rights and still wished to speak to agents without an attorney present.

19. Idlebird related to SAs Akard and Bell that he and the other two vehicle occupants were headed to Las Vegas for a bachelor party. Idlebird explained that he was picked up in Houston, Texas, and they proceeded on to Austin, Texas, before heading on to New Mexico. Idlebird stated that he had known Harrison for approximately one year, but that he had just met Wade. When asked by SAs what property in the vehicle belonged to him, Idlebird replied that he had a small camouflage satchel, a Glock Model 42 .380-caliber pistol, and approximately $6,000 in U.S. currency inside of the vehicle. Idlebird specifically asserted that approximately $4,408 in U.S. currency derived from his tax refund and approximately $1,200 in U.S. currency came from a stimulus payment.

## Tracy Wade Jr.

*First Interview of Tracy Wade Jr. by BPAs Aguilera and Delgado*

20. BPAs began the interview with Wade by asking about the vehicle and his travel plans. As to the vehicle he was driving, Wade claimed it was a rental acquired by either his mother or stepfather. Wade admitted that he could not rent on his own, as he does not possess a credit card. Wade then related that he traveled from his brother's residence in Killeen, Texas, and picked up Harrison in Austin, Texas. At that point, he claimed that Harrison told him they would be picking up someone else for the trip, whereupon they traveled to Houston to pick up Idlebird, who Wade had never met before. Wade stated, from there, Harrison had made

7

arrangements to party and sightsee in Las Vegas, but Wade emphasized he had personal plans in Vegas too, including getting supplies for his tattooing business and seeing other friends in the area. BPAs confronted Wade with the fact that Harrison claimed the two of them had been planning the trip for a few months. Wade denied that claim.

21. As to the vehicle's contents, Wade claimed that all three of the occupants had placed various amounts of money in the red Nike bag, but he did not know exactly how much he had put in the bag, although he believed it to be between $10,000 and $15,000 in U.S. currency. When asked about the empty plastic tote with marijuana residue in the rear of the vehicle with dryer sheets, Wade stated that he thought he had grabbed a tote full of blankets and pillows for the trip, but had instead grabbed an empty one. BPA Aguilera asked Wade how he could not tell the difference between an empty and a full tote, based – if nothing else – on the vast difference in weight. At that point, Wade looked defeated and discouraged, and simply shrugged and said he did not know.

*Second Interview of Tracy Wade Jr. by SAs Akard and Bell*

22. SAs Akard and Bell reminded Wade of his Miranda Rights by showing him the advice of rights form he previously signed. Wade acknowledged he still understood his rights and still wished to speak to agents without an attorney present.

23. Wade stated that he was headed to Las Vegas, Nevada, for a bachelor party and that he intended on staying at an AirBnB. Wade related that the vehicle was a rental picked up on May 2, 2020, in Killeen, Texas. Wade further stated that he departed Killeen, Texas, and went to Austin, Texas, to pick up Harrison, after which he went to Houston, Texas, to pick up Idlebird.

24. SAs then asked Wade which belongings in the vehicle were his. Wade claimed ownership of the Glock Model 19 9mm pistol found in the seat pouch behind the driver's seat, and admitted he knew there was a round in the chamber. In contrast, he specifically denied ownership of the Glock 23 with the 50-round drum. Wade also asserted ownership of a grey suitcase and a plastic bin inside of the vehicle. SAs asked Wade about the plastic bin, and Wade replied that he meant to grab one filled with blankets for the trip and must have grabbed the wrong one. The SAs noted that the plastic bin contained several drier sheets and drug residue, and based on the training and experience of both SAs Akard and Bell, containers with several drier sheets are consistent with attempting to conceal the odor of controlled substances.

25. SAs also asked Wade about the currency inside of the vehicle, and Wade replied that he had approximately $10,000 in U.S. currency inside of the red backpack. Agents asked Wade about his occupation, and Wade stated that he worked at Texas Roadhouse in Killeen, Texas.

### FIRST CLAIM FOR RELIEF

1. The United States incorporates by reference the allegations in paragraphs 1 through 25 as though fully set forth.

2. Title 21, United States Code, Section 881(a)(6) subjects to forfeiture "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter."

3. Defendant Currency was furnished, or intended to be furnished, in exchange for a controlled substance, or constitutes proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of the Controlled Substances Act and is thus subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

## SECOND CLAIM FOR RELIEF

4. The United States incorporates by reference the allegations in paragraphs 1 through 25 as though fully set forth.

5. Title 18, United States Code, Section 1952 prohibits interstate and foreign travel or transportation with the intent to (1) distribute the proceeds of any unlawful activity; (2) commit any crime of violence to further any unlawful activity; or (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity.  Unlawful activity is defined in 18 U.S.C. § 1952(b).

6. Defendant Currency is the proceeds of a violation of 18 U.S.C. § 1952 or is the proceeds traceable to such property and, is thus subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

WHEREFORE: Plaintiff seeks arrest of Defendant Currency and forfeiture of same to Plaintiff, determination of the validity and priority of claims of the Claimants and any Unknown Claimants to the Defendant Currency, costs and expenses of seizure and of this proceeding, and other proper relief.

Respectfully submitted,

JOHN C. ANDERSON
United States Attorney

*[signature]*

For STEPHEN R. KOTZ
KRISTOPHER DALE JARVIS
Assistant U.S. Attorneys
200 N. Church Street
Las Cruces, NM 88001
(575) 522-2304

## 28 U.S.C. § 1746 DECLARATION

I am a Special Agent with the Department of Justice, Drug Enforcement Administration who has read the contents of the Complaint for Forfeiture *In Rem* to which this Declaration is attached; and the statements contained in the complaint are true to the best of my knowledge and belief.

I declare under penalty of perjury and the laws of the United States of America that this Declaration is true and correct, except as to matters stated on information and belief, and as to those matters I believe them to be true.

Dated: 10/7/20

Loren Bell, Special Agent
Drug Enforcement Administration